UNITED STATES, Appellee,

v.

**Manuel Julio CARDALES, Defendant, Appellant.**

United States, Appellee,

v.

**Robinson Rafael Hernandez, Defendant, Appellant.**

United States, Appellee,

v.

**Arkel Hawkins Peterson, Defendant, Appellant.**

Nos. 97–2383, 97–2384 and 97–2385.

United States Court of Appeals, First Circuit.

Heard Nov. 3, 1998.

Decided Feb. 26, 1999.

---

**3.** We reject CITI's attempt to construe the added words "if any" as referring to more than claims for equitable relief.

Edgardo Rodríguez–Quilichini, Assistant Federal Public Defender and Víctor P. Miranda–Corrada, by appointment of the Court, with whom Joseph C. Laws, Jr., Federal Public Defender, were on joint brief, for appellants Manuel Julio Cardales and Robinson Rafael Hernández.

Linda Backiel for Arkel Hawkins Peterson.

Jonathan L. Marcus, Attorney, Department of Justice, with whom Guillermo Gil, United States Attorney, Timothy Faerber, Aixa Maldonado and José A. Quiles, Assistant United States Attorneys, were on brief, for appellee.

Before LYNCH, Circuit Judge, HALL,* Senior Circuit Judge, and LIPEZ, Circuit Judge.

CYNTHIA HOLCOMB HALL, Senior Circuit Judge.

Manuel Julio Cardales ("Cardales"), Robinson Rafael Hernández ("Hernández"), and Arkel Hawkins Peterson ("Peterson") appeal their convictions for aiding and abetting each other in the possession with intent to distribute marijuana on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. app. § 1903(a) and 18

* Of the Ninth Circuit, sitting by designation.

U.S.C. § 2. The district court sentenced Cardales to 120 months in prison, Hernández to 78 months in prison, and Peterson to 121 months in prison. Peterson appeals his sentence. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm.

## FACTS

At approximately 5:40 p.m. on May 31, 1996, a helicopter crew from the U.S.S. GROVES spotted a "go-fast" boat, the CORSICA, traveling at a very high rate of speed in waters approximately 150 miles south of Puerto Rico. The helicopter crew attempted to contact the boat by radio and by hand signal, but all efforts to communicate with the CORSICA were unsuccessful even though the CORSICA's radio was working. The defendants evaded the helicopter for over two hours, turning off the CORSICA's navigation lights when it grew dark. Eventually, the helicopter crew was able to steer the CORSICA toward the GROVES. When the defendants spotted the GROVES, they turned the CORSICA in the opposite direction and fled. When the CORSICA was close enough, the crew from the GROVES launched a rigid hull inflatable boat ("RHIB") to approach the CORSICA, but the RHIB's engine failed before it could make contact. While the crew from the GROVES launched a second RHIB, the helicopter returned to the GROVES for refueling. As a result of the first RHIB's breakdown and the helicopter's refueling, the CORSICA was out of sight for approximately fifteen minutes.

When the second boat reached the CORSICA, Peterson identified himself as the captain, and claimed the CORSICA was a Venezuelan vessel that had departed from Colombia to search for a lost boat. Peterson refused to allow the Coast Guard crew to board the CORSICA until the Venezuelan government consented. The Coast Guard crew sought authorization to board the CORSICA from Venezuela, but the Venezuelan government was unable to access the ship registry database at that time. The

Coast Guard crew boarded the CORSICA pursuant to a statement of no objection from Coast Guard headquarters, and shortly thereafter the Venezuelan government authorized the Coast Guard to board and search the CORSICA under the unverified assumption that the CORSICA was registered in Venezuela. When the officers searched the CORSICA, they noted that the CORSICA's radio was working, the forward cabin smelled of fuel, the carpet had indentations in it as if heavy objects had been resting on it, and pieces of what appeared to be burlap were woven into the carpet. However, the officers did not find any contraband, and returned to the GROVES.

Shortly after the officers returned to the GROVES, lookouts on board the GROVES noticed over twenty bales floating in the water. The crew from the GROVES recovered seventeen of the bales, which contained over 1080 pounds of marijuana. The marijuana was held in cardboard boxes, wrapped in plastic and tape, and marked with a yellow dye. The officers returned to the CORSICA, reboarded pursuant to the Venezuelan government's previous consent, and conducted a second search.

During the second search, officers found packing material that matched the material found in the bales recovered by the GROVES, yellow dye stains on the carpet that matched the yellow dye markers on the marijuana, and what appeared to be a marijuana stem that tested positive for THC, a chemical found in marijuana. The officers arrested the defendants, and the CORSICA was piloted to Puerto Rico. The officer who piloted the CORSICA noticed that the CORSICA skipped across the water as he drove it, which contrasted sharply to the CORSICA's bow-heavy condition during the chase.

On June 5, 1996, the Venezuelan government notified the State Department that the CORSICA was indeed of Venezuelan registry, reauthorized the boarding and search of the CORSICA, and authorized the arrest of and application of U.S. law to the CORSICA's crew. Cardales, Hernández, and Peterson were convicted of aiding and abetting each other in possessing with the intent to distribute marijuana while on board a vessel

subject to the jurisdiction of the United States in violation of 46 U.S.C. app. § 1903(a). The defendants appealed.

## DISCUSSION

### I

The Maritime Drug Law Enforcement Act ("MDLEA") makes it "unlawful for any person ... on board a vessel subject to the jurisdiction of the United States ... to possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C. app. § 1903(a). One of the MDLEA's definitions of a vessel subject to the jurisdiction of the United States is "a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States." *Id.* § 1903(c)(1)(C).

In this case, the defendants were convicted of aiding and abetting each other in the possession with intent to distribute marijuana on board a vessel, the CORSICA, subject to the jurisdiction of the United States. The CORSICA was registered in Venezuela, and the government of Venezuela consented to the application of United States law to the defendants. The government therefore satisfied the jurisdictional requirements of the MDLEA.

■ The defendants contend that the Fifth Amendment Due Process Clause requires the government to prove a nexus between their criminal conduct and the United States in a prosecution for violating the MDLEA. Although the MDLEA does not explicitly contain a domestic nexus requirement, the Ninth Circuit has read into the MDLEA a nexus requirement with respect to foreign-registered vessels. *See United States v. Klimavicius–Viloria,* 144 F.3d 1249, 1257 (9th Cir.1998) (requiring government to prove that offense conduct is likely to have effects in United States); *United States v. Davis,* 905 F.2d 245 (9th Cir.1990) (requiring sufficient nexus between criminal conduct and United States such that application of U.S. law would not be arbitrary or unfair). This nexus requirement, however, was specifically rejected by the Third Circuit. *See*

*United States v. Martinez–Hidalgo,* 993 F.2d 1052 (3d Cir.1993) (reasoning that statute does not contain nexus requirement, and that Congress intended MDLEA to override international law to extent nexus might be required).[1] We decide today that due process does not require the government to prove a nexus between a defendant's criminal conduct and the United States in a prosecution under the MDLEA when the flag nation has consented to the application of United States law to the defendants.

■ To satisfy due process, our application of the MDLEA must not be arbitrary or fundamentally unfair. *See Davis,* 905 F.2d at 248–49; *see also Martinez–Hidalgo,* 993 F.2d at 1056. In determining whether due process is satisfied, we are guided by principles of international law. *See Davis,* 905 F.2d at 249 n. 2. Under the "territorial principle" of international law, a "state has jurisdiction to prescribe and enforce a rule of law in the territory of another state to the extent provided by international agreement with the other state." *United States v. Robinson,* 843 F.2d 1, 4 (1st Cir.1988). In *Robinson,* we decided that the United States had jurisdiction over a Panamanian vessel stopped over 500 miles off shore because the Panamanian government authorized the United States to apply U.S. law to the persons on board the vessel. *See id.* (recognizing informal authorization as valid agreement for purposes of territorial principle, and affirming conviction under 21 U.S.C. § 955a, statutory precursor to MDLEA). In this case, the Venezuelan government authorized the United States to apply United States law to the persons on board the CORSICA. Therefore, jurisdiction in this case is consistent with the territorial principle of international law.

■ In addition, under the "protective principle" of international law, a nation is permitted "to assert jurisdiction over a person whose conduct outside the nation's terri-

tory threatens the nation's security." *Robinson,* 843 F.2d at 3; *see United States v. Romero–Galue,* 757 F.2d 1147, 1154 (11th Cir.1985); *United States v. Pizzarusso,* 388 F.2d 8, 10 (2d Cir.) (characterizing protective principle as applying only to conduct generally recognized among nations as a crime), *cert. denied,* 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968). Consistent with this principle, Congress specifically found in the MDLEA that "trafficking in controlled substances aboard vessels is a serious international problem and is universally condemned[, and] . . . presents a specific threat to the security . . . of the United States." 46 U.S.C. app. § 1902. Therefore, application of the MDLEA to the defendants is consistent with the protective principle of international law because Congress has determined that all drug trafficking aboard vessels threatens our nation's security. *See Martinez–Hidalgo,* 993 F.2d at 1056 ("Inasmuch as trafficking of narcotics is condemned universally by law-abiding nations, we see no reason to conclude that it is 'fundamentally unfair' for Congress to provide for the punishment of persons apprehended with narcotics on the high seas."); *cf. Church v. Hubbart,* 6 U.S. (2 Cranch) 187, 234–35, 2 L.Ed. 249 (1804) ("[A nation's] power to secure itself from injury may certainly be exercised beyond the limits of its territory.").

We therefore hold that when individuals engage in drug trafficking aboard a vessel, due process is satisfied when the foreign nation in which the vessel is registered authorizes the application of United States law to the persons on board the vessel. When the foreign flag nation consents to the application of United States law, jurisdiction attaches under the statutory requirements of the MDLEA without violation of due process or the principles of international law because the flag nation's consent eliminates any concern that the application of United States law may be arbitrary or fundamentally unfair.[2]

---

1. Although *Martinez–Hidalgo* involved a stateless vessel, the Third Circuit stated that its holding "obviously applies to any prosecution under the [MDLEA]." 993 F.2d at 1056 n. 6.

2. In *Martinez–Hidalgo,* the Third Circuit stated that the MDLEA "expresses the necessary congressional intent to override international law to

the extent that international law might require a nexus to the United States." 993 F.2d at 1056. The question of whether Congress intended to override international law is not presented here. To the extent that international law requires a nexus to the United States, that nexus requirement is not overridden by the MDLEA, but in-

## II

■ The defendants contend that the district court removed from the jury's consideration the jurisdictional element of the MDLEA.[3] Although the district court stated during the defendant's opening statements that there was jurisdiction, the court corrected itself in its jury instructions. The district court instructed the jury that it was required to find jurisdiction beyond a reasonable doubt. In addition, the district court explicitly corrected its earlier mistake, instructing the jury that it had "to make an independent final determination as to whether there is jurisdiction or not in this case" regardless of the court's earlier comments. Cf. Richardson v. Marsh, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (assuming that jurors follow instructions); Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 53 (1st Cir.1998) (same). Therefore, the district court did not take from the jury the MDLEA's jurisdictional element.

## III

■ The defendants contend that the district court erred by denying their Rule 29 motions for judgment of acquittal based on the sufficiency of the evidence. We will reverse the district court's denial of the defendants' Rule 29 motions only if, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in support of the verdict, no rational jury could find guilt beyond a reasonable doubt.[4] See United States v. Marrero–Ortiz, 160 F.3d 768, 772 (1st Cir.1998). The government presented sufficient evidence to prove that all three defendants (1) were on board a vessel subject to the jurisdiction of the United States, (2) knowingly or intentionally possessed marijuana, and (3) intended to distribute that marijuana. See Guerrero, 114 F.3d at 339.

First, the government introduced evidence from which the jury reasonably could have found that the United States had jurisdiction over the defendants. The government introduced testimony that the Venezuelan government authorized the Coast Guard crew to board and search the CORSICA. In addition, the Venezuelan government authorized the United States to apply United States law to the CORSICA's crew. See 46 U.S.C. app. § 1903(c)(1)(C).

Second, the government introduced evidence from which the jury reasonably could have found that the crew of the CORSICA had possessed the bales of marijuana found floating in the ocean. The government introduced evidence that (1) there were impressions in the CORSICA's carpet that matched the shape of the marijuana bales; (2) there was yellow dye on the CORSICA's carpet that matched yellow dye found in the bricks of marijuana; (3) there were cardboard pieces and packing tape on board the CORSICA that matched the materials used to package the marijuana; (4) the pieces of plastic removed from the CORSICA's carpet matched the thickness and type of plastic used to package the bales; (5) there was a piece of what appeared to be a marijuana stem on the CORSICA that tested positive for THC; and (6) a narcotics dog aboard the CORSICA alerted Coast Guard officers to

stead is satisfied by the foreign flag nation's authorization to apply U.S. law to the defendants and by the congressional finding that drug trafficking aboard vessels threatens the security of the United States.

**3.** The MDLEA has since been amended to eliminate jurisdiction as one of its elements, making it a threshold question for the trial court to resolve. See 46 U.S.C. app. § 1903(f).

**4.** Because Peterson presented a defense, he has waived review of the initial Rule 29 motion that he made at the close of the government's case. See United States v. Guerrero, 114 F.3d 332 (1st Cir.), cert. denied sub nom., Rivas v. United States, — U.S. —, 118 S.Ct. 320, 139 L.Ed.2d

248 (1997). With respect to Peterson, therefore, we may consider the evidence presented in both the government's case and in Peterson's defense. See id. at 339. However, we may not consider the evidence presented in Peterson's defense when reviewing the denial of the Rule 29 motions made by Cardales and Hernández at the close of the government's case. See United States v. Cruz–Paulino, 61 F.3d 986, 997–98 (1st Cir. 1995) (Rule 29 motions made at close of government's case reviewable on appeal when no defense presented). However, we discuss only the evidence presented in the government's case because the government introduced sufficient evidence to convict all three defendants without regard to Peterson's testimony.

the presence of drugs. In addition, the government introduced testimony that traced the bales found floating in the water to the location of the CORSICA at the time the bales were allegedly thrown overboard.

In addition, the government introduced sufficient evidence from which the jury reasonably could infer that the defendants knowingly possessed the marijuana. The government demonstrated that the defendants evaded the Coast Guard helicopter for over two hours, turning off their navigation lights when it got dark, failing to respond to radio contact even though their radio was working, and refusing to allow the Coast Guard crew to board when finally stopped. *See United States v. Leuro–Rosas,* 952 F.2d 616, 622 (1st Cir.1991); *United States v. Piedrahita–Santiago,* 931 F.2d 127, 131 (1st Cir.1991); *United States v. Passos–Paternina,* 918 F.2d 979, 985 (1st Cir.1990). The government demonstrated that the CORSICA was riding low in the water, suggesting that the CORSICA was laden with illegal cargo. *See Piedrahita–Santiago,* 931 F.2d at 131. The government demonstrated that the defendants tried to mask the presence of the marijuana by pouring gasoline on the CORSICA's deck. *See United States v. Romero,* 32 F.3d 641, 645 (1st Cir.1994). The government demonstrated that the CORSICA was carrying a large amount of marijuana relative to its size. *See Piedrahita–Santiago,* 931 F.2d at 131; *United States v. Cuevas–Esquivel,* 905 F.2d 510, 515 (1st Cir.1990). The government demonstrated that the defendants had traveled a great distance to reach the location where they were spotted. *See Piedrahita–Santiago,* 931 F.2d at 131; *United States v. Corpus,* 882 F.2d 546, 550 (1st Cir.1989). The government demonstrated that the defendants shared close relationships with each other ·because the three of them were on board a boat that was only forty-two feet long, they were all Colombians, and they worked closely together to operate the CORSICA. *See Cuevas,* 905 F.2d at 515. Finally, the government demonstrated that the marijuana recovered had a street value of up to $8 million.[5] *See Passos–Paternina,* 918 F.2d at 985.

Third, the government introduced evidence from which the jury reasonably could infer that the defendants intended to distribute the marijuana. The government demonstrated that lookouts aboard the GROVES spotted over twenty bales floating in the water. The crew of the GROVES recovered seventeen of the bales, which contained over 1080 pounds of marijuana. The jury reasonably could infer from the quantity of marijuana recovered that the defendants intended to distribute the marijuana. *See Guerrero,* 114 F.3d at 344; *United States v. Echeverri,* 982 F.2d 675, 678 (1st Cir.1993).

## IV

■ Peterson contends that the district court erred by denying his motion for a mistrial under Rule 16 of the Federal Rules of Criminal Procedure and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), based on the government's failure to disclose pretrial a laboratory report that showed that the CORSICA's carpet tested negative for marijuana and THC. During the government's direct examination of one of its witnesses, the witness disclosed for the first time the existence of a laboratory test showing that the CORSICA's carpet tested negative for the presence of marijuana and THC. The defendants objected to this testimony, but the test was admitted into evidence and the defendants were provided with a copy of the test for the first time.

■ We will reverse the district court's denial of Peterson's motion for a mistrial based on the alleged *Brady* violation only if the district court abused its discretion. *See United States v. Devin,* 918 F.2d 280, 289–90 (1st Cir.1990). In the case of delayed disclosure, we examine whether Peterson's " 'counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting' " Peterson's case. *See United States v. Catano,* 65 F.3d 219, 227

---

5. Although Peterson claimed in an issue heading in his brief that the district court erred in admitting evidence of the marijuana's street · value, Peterson failed to develop this argument in his brief, and therefore waived review of this argument. *See Gemco Latinoamerica, Inc. v. Seiko Time Corp.,* 61 F.3d 94, 101 (1st Cir.1995).

(1st Cir.1995) (quoting *United States v. In-graldi,* 793 F.2d 408, 411–12 (1st Cir.1986)). We find that the district court did not abuse its discretion because Peterson's counsel effectively used the report during the presentation of Peterson's case.

Peterson's counsel effectively cross-examined the government witness who disclosed the report, and used the test results in its closing argument. *See Catano,* 65 F.3d at 227. Peterson's counsel did not attempt to recall any of the government's earlier witnesses. In addition, Peterson's counsel failed to request a continuance, indicating that she was not prejudiced by the delayed disclosure. *See United States v. Innamorati,* 996 F.2d 456, 480 (1st Cir.1993); *Ingraldi,* 793 F.2d at 411–12.

### V

 Peterson contends that the district court erred by failing to ask all potential jurors about any positive bias they might have held toward the testimony of law enforcement officers. However, this bias inquiry was requested with respect to only two prospective jurors, and the district court made the requested inquiry in both instances. Because Peterson failed to make this request with respect to all prospective jurors, we review this issue only for plain error. *See United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

We decline to adopt a rule requiring trial courts to make a routine inquiry into the possible bias all prospective jurors might have toward law enforcement testimony because it would "establish a per se rule that is simply inconsistent with the broad deference traditionally and wisely granted trial courts in their conduct of voir dire." *See United States v. Lancaster,* 96 F.3d 734, 740–41 (4th Cir.1996) (en banc); *see also United States v. Gonzalez–Soberal,* 109 F.3d 64, 69 (1st Cir. 1997) (giving substantial deference to district court's conduct of voir dire); *United States v. Medina,* 761 F.2d 12, 20 (1st Cir.1985) (giving trial court broad discretion in conduct of voir dire). Because the district court did not err, there was no plain error.

Peterson's reliance on *United States v. Victoria–Peguero,* 920 F.2d 77 (1st Cir.1990), *United States v. Anagnos,* 853 F.2d 1 (1st Cir.1988), and *United States v. Pappas,* 639 F.2d 1 (1st Cir.1980), is misplaced because in each of those cases the defendant's counsel specifically requested the judge to make the bias inquiry, and the judge refused to do so. As stated above, Peterson's counsel made that request with respect to only two jurors, and the district court complied with both requests.

### VI

 Peterson contends that the district court erred by refusing to instruct the jury not to give greater credibility to the testimony of government agents than to the testimony of nongovernment witnesses. We review the district court's jury instructions for abuse of discretion, "to determine whether the charge, taken as a whole fairly and adequately submit[s] the issues in the case to the jury." *United States v. Roberts,* 119 F.3d 1006, 1016 (1st Cir.1997) (citation omitted). The district court did not err.

Peterson never proposed a jury instruction on the credibility of law enforcement witnesses. Cardales, however, orally requested that the court give "the pattern instruction for the Fifth Circuit or the one in Devitt & Blackmar for law enforcement witnesses." Neither one of these two sources, however, contains an instruction on the credibility of law enforcement witnesses. The district court could not have erred by refusing to give a nonexistent instruction.

Even if one of the defendants had submitted a credibility instruction, the district court would not have abused its discretion by denying it. The district court instructed the jury that it was the sole judge of the credibility of the witnesses, and that in evaluating the credibility of a witness it should consider whether the witness had any relationship with the government or the defense. Taken as a whole, the district court's instructions fairly and adequately submitted the case to the jury. *See United States v. Angiulo,* 897 F.2d 1169, 1208 (1st Cir.), *cert. denied,* 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98

(1990). The district court's instructions were therefore proper.

## VII

■ Peterson contends that the district court abandoned its role of judicial neutrality and therefore deprived him of his right to a fair trial by striking the defendant's opening statement and by asking witnesses misleading and one-sided questions. We will find judicial bias only if a reading of the entire record leaves us with an abiding impression that the judge substantially intervened. *See U.S. v. Cruz–Paulino,* 61 F.3d 986, 997 (1st Cir.1995); *United States v. Twomey,* 806 F.2d 1136, 1141 (1st Cir.1986). Upon a careful review of the entire record, we are left with no abiding impression of judicial bias.

## VIII

Peterson contends that the district court made a series of erroneous evidentiary rulings, the cumulative effect of which denied Peterson his right to a fair trial. We review each of the district court's evidentiary rulings for abuse of discretion, and then examine Peterson's cumulative error claim. *See Williams v. Drake,* 146 F.3d 44, 46 (1st Cir. 1998). The district court did not abuse its discretion.

■ First, Peterson contends that the district court erred by denying his motion in limine to exclude evidence of his prior deportation from Puerto Rico. Peterson's unlawful entry into Puerto Rico was relevant to show Peterson's character for truthfulness, and was therefore admissible to impeach Peterson on cross-examination.[6] *See* Fed.R.Evid. 608(b); *cf. United States v. Cambindo Valencia,* 609 F.2d 603, 633–34 (2d Cir.1979). The district court, therefore, did not err by denying Peterson's motion in limine.

■ Second, Peterson contends that the district court erred by preventing his trial counsel from refreshing the recollection of one of the government's witnesses. However, the district court merely prevented Peter-

son's counsel from repeatedly and improperly asking, "Has your recollection been refreshed?" to impeach the government's witness when the witness had never indicated that he did not recall his previous statements. The district court did not otherwise prevent Peterson's counsel from legitimately refreshing the recollection of this witness.

■ Third, Peterson contends that the district court erred by permitting the government to refresh the recollection of one of its witnesses during redirect examination. The district court did not abuse its discretion when, after Officer Epps testified that his report did not mention a field test on a marijuana stem, it allowed the government to refresh Epps' recollection by showing Epps his report indicating that he had field tested a marijuana stem. *Cf. United States v. Carroll,* 105 F.3d 740, 742 (1st Cir.) (refreshing recollection by reading reports of interviews given to FBI agents), *cert. denied,* 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997).

■ Fourth, Peterson contends that the district court erred by not permitting Peterson to refresh the recollection of one of the government's witnesses during cross examination. The district court did not abuse its discretion when it denied Peterson's request to refresh Officer Langevin's recollection with log books Langevin did not prepare when Langevin could not recall whether Epps had field tested a piece of cardboard or some other material. *See United States v. Boyd,* 606 F.2d 792, 794 (8th Cir.1979); *cf. NLRB v. Federal Dairy Co.,* 297 F.2d 487, 489 n. 3 (1st Cir.1962) (forbidding misuse of written aids).

■ Fifth, Peterson contends that the district court erred by allowing one of the government's witnesses to testify about corroborating evidence of the defendant's guilt. The district court did not err by permitting Officer Taravela to testify about the corroborating evidence because Cardales' counsel asked Taravela about the cause for the defendants' arrests, thereby opening the door for the government to explore on redirect the grounds for the arrests. *Cf. United States v.*

---

6. Peterson's counsel asked Peterson about his prior deportation during direct examination.

The government did not mention Peterson's prior deportation during the trial.

*Ariza–Ibarra,* 605 F.2d 1216, 1226 (1st Cir. 1979).

Because we find that the district court did not err in any of the evidentiary rulings challenged on appeal, Peterson's cumulative error argument necessarily fails.

## IX

■ Peterson contends that the district court erred by enhancing his sentence under U.S.S.G. § 3C1.1 for obstruction of justice based on a finding of perjury. We will reverse the district court's obstruction of justice sentencing enhancement only if the district court clearly erred in finding that Peterson committed perjury. *See United States v. McKeeve,* 131 F.3d 1, 15 (1st Cir. 1997). The district court did not err.

■ The district court found that Peterson had committed perjury when he testified that he had been hired to search for a lost boat in the area where the helicopter crew spotted the CORSICA. The court found unbelievable the story that Peterson, who claimed to be a salesman, had been hired to travel such a great distance to conduct a less-than-two-hour search for the allegedly missing boat, that the missing boat happened to get lost in an area conducive to drug trafficking, and that Peterson's knowledge of the CORSICA was deficient.[7] *See United States v. Matiz,* 14 F.3d 79, 84 (1st Cir.1994) (defining elements of perjury as "falsity, materiality, and willfulness"). Thus, the district court did not err by enhancing Peterson's sentence for obstruction of justice. *See* U.S.S.G. § 3C1.1, application note 1 (including as obstruction of justice "a denial of guilt under oath that constitutes perjury").

Peterson's argument that the district court enhanced his sentence merely for being convicted after testifying in his defense is without merit. The district court specifically stated that it was not enhancing Peterson's sentence on that improper basis, and engaged in a detailed discussion of the perjurious nature of Peterson's testimony.

7. For example, Peterson did not know how many gallons of fuel the CORSICA was carrying or

## CONCLUSION

Based on the foregoing, we **affirm** the judgment of the district court.

how many miles the CORSICA could travel.